IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| CHRIS STREETER, | ) |
| Plaintiff. | ) ) ) |
| v. | ) Court No. 07 C 299 |
| SOO LINE RAILROAD, | ) ) ) |
| Defendant. | ) |

**PLAINTIFF'S RESPONSE BRIEF TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

NOW COMES the Plaintiff, CHRIS STREETER, by and through his attorneys, HOEY AND FARINA, P.C. and GEORGE T. BRUGESS, and for his Response to Defendant's Motion for Summary Judgment, states as follows:

**I. Background Facts**

On April 5, 2004, Streeter reported to work at the Portage Yard at 22:30 (10:30 p.m.) (Plaintiff's Response to Defendant's Proposed Findings of Fact and Plaintiff's Additional Statement of Fact [SOF] ¶22; Streeter's Dep. p. 37). His engineer was Dennis Bennet. (SOF ¶22; Streeter's Dep. p. 36). They were assigned to take train 284 from Portage to Milwaukee, Muskego Yard. (SOF ¶22; Streeter's Dep. p. 36). They boarded the lead locomotive and got underway, it was a straight shot from Portage to Milwaukee. (SOF ¶22; Streeter's Dep. p. 39). They arrived in Muskego yard at about 1:30 a.m. on April 6, 2004. (SOF ¶22; Streeter's Dep. pp. 36-37).

Upon arriving in Muskego Yard an alarm in the locomotive sounded and the engineer discovered a fire in the locomotive that they were riding in. (SOF ¶¶2 and 3; Streeter's Dep. pp. 41-48). The compartment with the locomotive's dynamic brake grids was on fire. (SOF ¶23;

Streeter's Dep. p. 48). The grids overheated and caught fire when the blower fan malfunctioned. (SOF ¶34; Streeter's Aff. ¶5; Streeter's Dep. p. 78).



(Streeter's Aff. ¶6)

Engineer Bennet commenced fighting the fire with Streeter's assistance; he told Streeter to get fire extinguishers. (SOF ¶¶4, 5 and 29; Streeter's Dep. pp. 49, 53-71). They radioed the yardmaster to call the fire department. (SOF ¶26; Streeter's Dep. pp. 51-52). It was a panic situation. (SOF ¶¶32 and 37; Streeter's Dep. pp. 64 and 82). There were train cars loaded with lumber on a track near the burning locomotive that were in danger of catching fire. (SOF ¶37; Streeter's Dep. p. 82). There were tank cars on nearby tracks that Plaintiff was afraid would blow up. (SOF ¶37; Streeter's Dep. p. 82). It was a disaster in the making. (SOF ¶37; Streeter's Dep. p. 82). This was an emergency and they had to get the fire out. (SOF ¶28; Streeter's Dep. p. 53).

Streeter ran to a nearby locomotive to get more fire extinguishers. (SOF ¶¶27 and 30; Streeter's Dep. pp. 52-53, 62). As Streeter was carrying a fire extinguisher down the ladder on a

2

nearby locomotive his foot stuck in the bottom rung and he twisted his knee. (SOF ¶30; Streeter's Dep. p. 62). Streeter had his right hand on the grab iron and the fire extinguisher between his left elbow and ribs. (SOF ¶31; Streeter's Dep. p. 56). He could not hold onto the handrail on the ladder with his left hand because he was holding the fire extinguisher, but he had his left elbow up against the grab iron on the ladder of the locomotive. (SOF ¶31; Streeter's Dep. p. 56). The fire department arrived and the fire was extinguished. (SOF ¶33; Streeter's Dep. p. 77). Streeter and Bennet were heroes.

Streeter was climbing down the ladder with the fire extinguisher under his arm when his foot caught causing his knee to twist. As a result, the anterior cruciate ligament (ACL) of Streeter's right knee and the medial meniscus were torn. (SOF ¶¶14 and 16; Brugess' Aff. Exs. A and B). Streeter underwent surgery to repair the damage, including harvesting then grafting a piece of patellar tendon to repair the torn ACL and resecting the meniscus. (SOF ¶¶14 and 16; Brugess' Aff. Exs. A and B). Streeter underwent a second surgery to perform further repairs on the meniscus. (SOF ¶¶14 and 16; Brugess' Aff. Exs. A and B). As a result of his knee injury Streeter has a shortened worklife expectancy. (SOF ¶18; Brugess' Aff. Ex. C). He is likely to develop arthritis, will likely need additional arthroscopic surgery and may eventually need a total knee replacement. (SOF ¶14; Brugess' Aff. Ex. A).

## II. Locomotive Inspection Act (LIA)

Plaintiff's complaint explains that the Soo Line Railroad violated the Federal Employers' Liability Act (FELA), 45 U.S.C. 51, *et seq*., the Locomotive Inspection Act, 49 U.S.C. 20701, and applicable federal regulations found at 49 C.F.R. Part 229, when the locomotive malfunctioned and caught on fire thereby causing Chris Streeter severe injuries. Violation by the railroad of a safety act, such as the LIA or the Safety Appliance Act (SAA), 49 U.S.C. 20302, or of a federal regulation, results in absolute liability under the FELA. *Schmitz v. Canadian Pacific*

*Railway*, 454 F.3d 678 (7th Cir. 2006). Violation of a statutory or regulatory duty gives rise to FELA liability regardless of whether the statute or regulation was meant to protect against the particular harm sustained. *Schmitz* at 683. A rail carrier's duty under the LIA or SAA is absolute; the employee need only show a violation, and no showing of negligence is required. Once a violation is established, only causal relation is in issue. *McGowan v. Wisconsin Central*, 2005 WL 2077335 (E.D. Wis.).

### a. The LIA was violated

The LIA states, "A railroad carrier may use or allow to be used a locomotive or tender on its railroad line only when the locomotive or tender and its parts and appurtenances-(1) are in proper condition and safe to operate without unnecessary danger of personal injury . . ." 49 U.S.C. 20701. There can be no doubt that a burning locomotive presents an unreasonable danger to the crew. Plaintiff would respectfully request that the Court find, as a matter of law, that when a train crew is operating a locomotive and the locomotive starts on fire, that the LIA is violated.

### b. Federal regulations were violated

49 C.F.R. 229.45 provides, "All systems and components on a locomotive shall be free of conditions that endanger the safety of the crew, locomotive or train." This is a mirror regulation to the LIA. It is hard to conceive of a situation where a fire on a manned locomotive does not violate this regulation.

49 C.F.R. 229.13 provides, "If a dynamic brake or regenerative brake system is in use, that portion of the system in use shall respond to control from the cab of the controlling locomotive." This regulation was violated since it is clear the engineer did not give a command for the dynamic brake to catch on fire.

4

49 C.F.R. 229.46 provides, "The carrier shall know before each trip that the locomotive brakes and devices for regulating all pressures, including but not limited to the automatic and independent brake valves, operate as intended and that the water and oil have been drained from the air brake system." The dynamic brakes did not operate as intended; the dynamic brake grid caught fire. This regulation was violated.

49 C.F.R. 229.119 provides, "Floors of cabs, passageways, and compartments shall be kept free from oil, water, waste or any obstruction that creates a slipping, tripping or fire hazard." Consequently, any fire in a locomotive compartment violates this regulation. Moreover, all of these regulations should be broadly construed to further the intent of providing for the safety of railroad operating crews. As the Supreme Court explained, the FELA should be liberally construed in order to accomplish the Act's humanitarian purpose. *Urie v. Thompson*, 337 U.S. 163, 180, 181, 69 S.Ct. 1018, 1030 (1949). Not only was there a fire hazard in the compartment of the locomotive, there was a fire.

### c. Proof of a defect is not required

It is basic FELA law that an injured railroad employee claiming a violation of the LIA or associated regulations need not prove the existence of any specific defect to establish liability. This basic tenet of FELA law was explained in *O'Donnell v. Elgin Joliet and Eastern Railway Company,*, 338 U.S. 384, 70 S.Ct. 200, 94 L.Ed. 187 (1950). In *O'Donnell,* Plaintiff was injured when a coupler fractured. Plaintiff tendered an instruction saying, "That to equip a rail car with a coupler which broke in switching operations was a violation of the SAA which made Defendant liable for injuries resulting therefrom. Plaintiff's tendered instruction made clear that neither evidence of negligence nor of diligence and due care were to be considered on the question of liability." The trial judge refused the instruction; the Seventh Circuit Court affirmed; the Supreme Court reversed holding that a violation of the SAA is established once Plaintiff

shows the equipment failed to perform as required. There is no requirement that Plaintiff establish a defect in order to prevail under the FELA based on a LIA violation, Plaintiff need only prove that the equipment failed to perform as intended. Here, Streeter wins if the trier of fact agrees that a blazing locomotive is not performing as intended. To the extent a burning locomotive endangers the crew, or violates one of the above federal regulations, liability is established.

In *Rogers v. E.J. & E. Ry. Co.*, 248 F.2d 710, 712 (7th Cir. 1957), the court said, "The application of the SAA does not in our judgment depend upon proof of the cause of the defective condition of the equipment. The obligation imposed upon the carrier is absolute, not conditional."

The court in *McCarthy v. Pennsylvania R. Co.*, 156 F.2d 877, 880 (7th Cir. 1946) described the rule as, "No notice to the defendant constructive or otherwise, as to the defective unsafe condition of the locomotive was necessary to be shown. . . . This section of the SAA imposes on the carrier the absolutely and continuous duty to have its locomotives equipped with parts and appurtenances which are safe when in their normal place."

The same argument made by Defendant here was rejected in *Grogg v. Miss. Pac. RR Co.*, 841 F.2d 210 (8th Cir. 1988). *Grogg* was hurt when the train unexpectedly went into an emergency stop. She claimed a violation of the SAA brake regulation. The railroad moved for a directed verdict claiming Plaintiff could not show any specific defect that caused the train to stop suddenly. The trial court directed a verdict in favor of the railroad, but was reversed on appeal. The Eighth Circuit said:

> To recover for a violation for the FSAA Grogg had to show: (1) the statute was violated; and (2) the violation was 'a causative factor contributing in the whole or in part to the accident' that caused her injuries. She was not required to prove Missouri Pacific was negligent, or that a specific air brake hose was defective. To prove the equipment on Missouri Pacific's train was in violation of the FSAA,

> Grogg could show either evidence of 'some particular defect, or the same inefficiency may be established by showing a failure to function, when operated with due care, in the normal, natural, and usual manner. Proof of an actual break or visible defect is not a prerequisite to a finding that the statute has been violated. Where a jury finds that there is a violation, it will be sustained, if there is proof that the mechanism failed to work efficiently and properly. The test in fact is the performance of the appliance.'

841 F.2d 212 (citations omitted).

Defendant argues in its brief that Plaintiff must have expert testimony to establish the cause of the fire. But, Defendant cites to no authority in support of this dubious proposition and cannot, because this is not the law. Plaintiff does not need an expert to testify a burning locomotive is a danger to the crew operating it. All Streeter needs to show here is that the locomotive caught on fire and that the burning locomotive failed thereby to function in the normal, natural and usual manner. It is hard to imagine a jury not finding a burning locomotive a violation of the LIA.

In *Givens v. Miss.-Kan-Tex R. Co. of Tex.*, 195 F.2d 225 (5th Cir. 1952), Plaintiff was the conductor on a train that broke down en route. The wheels on the locomotive broke. The railroad claimed it was an unavoidable accident, and that no one could say why the wheels broke. Judgment was entered for the railroad and reversed on appeal. More importantly, the Fifth Circuit ordered judgment entered for Plaintiff since the breakdown of the locomotive was a violation of the LIA *as a matter of law.* The court said, "A locomotive cannot be in proper condition or safe to operate in the service to which it is put if it will not operate at all… We think that the slipping tires and consequent breakdown of the locomotive while being used on Defendant's line established a violation of the BIA as a matter of law." 195 F.2d 229. The same can be said here: a locomotive that bursts into flames cannot be in proper condition or safe to operate. Therefore, there is clearly a violation of the LIA by the railroad when the locomotive Streeter was conductor on burst into flames.

One final note. Defendant claims that Plaintiff was not in any danger from the fire in part III of its brief, and that therefore there was no violation (see pp. 4-5 of Defendant's Brief). ("The record, therefore, demonstrates that plaintiff was not in any danger from the fire, and the fire, in and of itself, was not a condition that would endanger the crew and impose liability under the LIA."). Inexplicably, Defendant goes on to claim, in part V.c. of its brief, that, "Immediately following the alleged incident, Plaintiff was treated at an emergency room for smoke inhalation." (Defendant's Brief at p. 9). This type of internal inconsistency demonstrates the disingenuous nature of the railroad's motion. How can the railroad argue that Streeter was never in any danger from the burning locomotive, then later argue his only injury was smoke inhalation from the burning locomotive? Isn't smoke inhalation one of the dangers from a fire on a locomotive? The railroad cannot honestly believe that an employee it admits was treated at the emergency room for smoke inhalation from a locomotive fire was not in danger.

### III. Causation

In *Givens,* after the locomotive breakdown, Plaintiff was required to stand ¾ mile down the track from the stricken train. His assignment was to flag down and stop any approaching train before it could run into the broken-down train. It was bitter cold and Plaintiff was severely frostbitten. The railroad argued that the injury was too remote to be caused by the LIA violation. The jury found for the Plaintiff and the court affirmed the jury finding on causation. 156 F.2d 877.

The law on causation in LIA/FELA cases is that if an employee is injured while an employee is trying to remedy the statutory or regulatory violation, the violation is the cause of the injury. However, once the employee reaches a safe place and moves onto other tasks unrelated to the violation, the chain of causation ends. This is consistent with the broad definition of causation in FELA cases under *Rogers v. Missouri Pacific Railroad*, 352 U.S. 500,

506, 77 S.Ct. 443, 448, (1957), where the Supreme Court held, "Under this statute the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought."

In *Elston v. Union Pacific*, 74 P.3d 478 (2003), the locomotives were not properly communicating with the end-of-train device in violation of the LIA. Plaintiff was required to walk to the end of the train to input new numbers into the end-of-train device. While walking along the tracks, he tripped, fell and was injured. The trial court granted summary judgment to the railroad and was reversed on appeal. The Appellate Court said, "In light of the fact that Plaintiff was returning from the repair site and had not begun duties unrelated to the alleged LIA violation, we conclude the trial court improperly granted summary judgment." 74 P.3d 485. The case was returned to the trial court for adjudication on the merits. Of course, here, Streeter was still actively fighting the locomotive fire when he was hurt. There is no question that the railroad's violation of the LIA was a cause of Streeter's injury.

In *Richards v. Consolidated Rail*, 330 F.3d 428 (6th Cir. 2003), the court did a thorough analysis of the causation issue in an SAA or BIA (Boiler Inspection Act, now known as the Locomotive Inspection Act) case. The court held that a jury question is created if the defective appliance *played any part even the slightest* in bringing about Plaintiff's injury. *Richards* also involved a situation where Plaintiff, while walking along the tracks investigating an SAA violation, fell and was injured. The court reversed summary judgment for the railroad and remanded the case for trial. *Richards* is especially instructive because the Court reversed a long line of cases that had imposed a restrictive definition of causation on FELA/LIA cases. "Courts in FSAA cases (and FELA and BIA cases as well) should focus on whether a reasonable jury could conclude that the defective appliance played *any* part, even the slightest, in bringing about

9

the plaintiff's injury. This means that if a reasonable jury could find that the plaintiff's injury 'was within the risk created by' the defective appliance, the plaintiff's right to a jury trial should be preserved. For example, if as a result of a defective appliance a plaintiff is required to take certain actions and he or she is injured while taking those actions, the issue of causation should be submitted to a jury." 330 F.3d 437. Like the Plaintiffs in *Elston* and *Richards,* Streeter was actively engaged in responding to a LIA violation when he tripped and severely injured his knee. Under the holdings in *Elston* and *Richards* there is sufficient evidence here to create a jury question.

Numerous courts have held that an SAA or LIA violation causes an injury if the employee is in any way engaged in dealing with the violation. The chain of causation is unbroken until the employee reaches a place of safety and begins work on a new task unrelated to the violation. See *Day v. Union Pacific Railroad*, 2004 WL 726 809 (D.Kan.); *Wilson v. Union Pacific Railroad*, 56 F.3d 1226 (10th Cir. 1995). Defendant's brief suffers from a substantial misunderstanding of FELA law on the causation prong of a LIA violation.

**IV.     Medical Causation**

The railroad (incredibly) claims Plaintiff will not be able to establish at trial a medical connection between the April 6, 2004, LIA violation and his knee injury. Defendant brief, p. 9. ("Here, plaintiff has identified no experts who could testify that his knee injury was caused by the alleged incident"). Not only does Plaintiff's medical expert, Dr. Gates, opine that the April 6, 2004, accident caused Plaintiff's knee injury, *Defendant's medical expert*, Dr. Haskell also opines that the April 6, 2004, accident caused Plaintiff's knee injury**!**

Dr. Gates' report includes his opinion on medical causation: "Causation: Based on the records reviewed, all of the treatment and the current condition of the right knee are a direct result of the accident of 6-4-04 [sic 4-6-04]". Dr. Gates' report contains a diagnosis for Mr.

10

Streeter's injury: "Diagnosis: 1. Torn anterior Cruciate ligament right knee, post repair, arthroscopic patellar tendon graft, right knee. 2. Torn medial meniscus, post repair, post re-tear and arthroscopic resection, right knee. 3. Post-traumatic degenerative arthritis right knee." Dr. Gates' report contains the following history: "Mr. Streeter, a 44 year old man, injured his right knee on 4-6-04 when he was getting off of a locomotive, his foot got stuck and he twisted the knee. He felt a pop and had immediate pain." (Brugess' Aff. Ex. A).

In Dr. Haskell's report, the railroad's medical expert expresses the identical opinion on medical causation: "Based on the history provided to us, review of the medical records and examination today, it is my opinion that Mr. Streeter sustained an anterior cruciate ligament injury with a tear of the posterior horn of the medial meniscus as the result of a work-related incident on 4-6-04." (Brugess' Aff. Ex. B).

For the railroad here to claim that Plaintiff is unable to show a connection between the accident of April 6, 2004 and his knee injury is a patently frivolous argument.

**V.     Permanency**

The railroad in Part VI of it brief claims there is no evidence that Streeter's serious knee injury is a permanent injury. This is another instance where the railroad has inexplicably failed to read its own experts' reports and thereby misstates the evidence.

The evidence will show that Plaintiff's expert Dr. Gates opined that as a result of the knee injury, Streeter has post-traumatic arthritis in the knee. (Brugess' Aff. Ex. A, Diagnosis number 3). Dr. Gates goes on to say, "It is more probable than not that the degenerative arthritis in the right knee will progress over time and that at some point in time he may need further surgery, another arthroscope to 'clean out' the knee and at some time in the future a total knee replacement." (Brugess' Aff. Ex. A).

11
Case 2:07-cv-00299-LA   Filed 10/31/08   Page 11 of 15   Document 31

Plaintiff's expert Rod Durgin opined that, "In January 2006, Mr. Streeter returned to work at Canadian Pacific Railway under a reduced capacity to perform work. As a disabled worker, he can expect to experience reduced employability over the remainder of his work life. It is also my opinion that Mr. Streeter is currently working beyond his physical and exertional limitations. Additionally, the government notes that he can expect to have a reduced work life." (Brugess' Aff. Ex. C).

Defendant's expert from Vocational Professionals, Inc. states, at p. 6 of her report, "<u>Vocational Impact</u>  On 10/19/05, Dr. Mannebach assigned 15% permanent partial disability and opined an end of healing had occurred. He noted Chris should avoid or minimize high impact activities, deep squatting and kneeling. On 11/8/05, Dr. Mannebach noted that Mr. Streeter should avoid or minimize walking on uneven terrain, jogging and jumping off of moving equipment. He opined that Chris would '*most likely*' be unable to return to work as a conductor, but stated, '*I believe that he can safely, however, partake in those duties as an engineer without any significant risk of causing further damage to his right knee.*' (Brugess' Aff. Ex. D).

This is another fumble by the railroad. How can the railroad claim Plaintiff has no evidence of permanency when Plaintiff's disclosed experts clearly express that opinion? And, when the railroad's own vocational expert acknowledges in her report that Streeter has a 15% permanent partial disability in his knee and can never return to the job of railroad conductor he was doing on the day of his accident? Plaintiff has produced sufficient evidence of permanency for the jury to consider this element of damages.

## VI.     The Frazier Affidavits

Counsel for Soo Line filed not one but two faulty affidavits with his motion for summary judgment. The first affidavit swore Plaintiff supposedly did not disclose any experts. However, Plaintiff filed his proof of service with the court, evidencing his service of Rule 26(a)(2)(A) and

(B) expert reports (based upon past experience, and anticipating that Defense counsel might "forget" receipt of the discovery documents). See Docket entry #19. Moreover, Railroad Counsel forgot that the defense expert, at Vocational Professionals, Inc., said, in her report, that she had reviewed reports of Plaintiff's experts that she received from Frazier. See Vocational Professional Inc.'s August 6, 2008, report ("Attorney William H. Frazier provided the following documents: reports from . . . Rod W. Durgin, Ph.D. . . . Dennis J. Gates, M.D., F.A.C.S.") Rod Durgin and Dr. Gates are Plaintiff's disclosed experts, whose reports were served on Defendant on February 28, 2008, in compliance with the Court's scheduling order. (Docket entry # 17). Once it was obvious that the court file and his own expert's report belied his affidavit, Defense Counsel was cornered with no escape except to admit his first affidavit was untrue. (Plaintiff's counsel, having known Mr. Frazier for many years, does not suggest that his first false affidavit was intentional; merely negligent. He should have done a diligent investigation before making the affidavit.)

Upon being called out on his incorrect affidavit, Frazier filed a second affidavit admitting the receipt of the reports, but wrongly claiming Plaintiff's experts' reports were not consistent with the scheduling order or Local Rule 26.1. Inexplicably, Frazier fails to specify any deficiency or explain how Plaintiff's experts' reports were supposedly not in compliance. The affidavit does not consist of facts, such as the rule requires; nor explain why he claims the disclosure is deficient; rather the affidavit contains solely conclusions. It is impossible to respond to such conclusory claims, other than to say the reports comply with all applicable rules and orders. Defendant not only should be barred from making new arguments for the first time in its reply, but the amended Frazier affidavit should be stricken because it is conclusory.

**VII. Conclusion**

The locomotive provided by the Soo Line to Plaintiff, and in use on its line, burst into flames, making that locomotive unsafe as a matter of law. Under longstanding law on FELA/LIA violations, the railroad here violated the LIA and the associated regulations, and that violation caused Plaintiff's injuries sustained while fighting the fire. Therefore the railroad is absolutely liable to Plaintiff under the FELA.

WHEREFORE, Plaintiff moves that Defendant's Motion for Summary Judgment be denied.

Respectfully submitted,
HOEY AND FARINA, P.C.

/s/George T. Brugess
George T. Brugess

HOEY AND FARINA, P.C.
542 S. Dearborn, Suite 200
Chicago, IL 60605
312/939-1212

**PROOF OF SERVICE BY E-FILING**

  George T. Brugess, an attorney, certifies that he served a copy of the above listed document upon the attorney listed below by e-filing and by placing a copy thereof in the United States Mail box located at 542 S. Dearborn, Chicago, Illinois addressed as below, with proper postage affixed at or before 5:00 on October 31, 2008.

    William H. Frazier
    Godfrey, Braun & Frazier, LLP
    735 North Water Street, Sixteenth Floor
    Milwaukee, WI  53202-4188


          /s/George T. Brugess
          George T. Brugess


HOEY AND FARINA, P.C.
542 S. Dearborn, Suite 200
Chicago, IL 60605
312/939-1212